PEOPLE, PLAINTIFF AND APPELLEE, v. HEIRS OF SERRALLÉS,
DEFENDANTS AND APPELLANTS.

APPEAL from the District Court of Ponce in a Prosecution
for Violation of Act No. 91 of 1919.

No. 1977.—Decided April 17, 1923.

LABOR CONTRACT — PAYMENT OF WAGES — DEDUCTION FROM WAGES — CONSTITU-
TIONAL LAW.—In this case the evidence shows that the laborer was work-
ing for the defendants for weekly wages; that the custom of the defend-
ants was to give the laborers tickets which were punched every day to show
the time the laborer had worked and the amount he had earned; that a
certain Juan de Dios Colón nominally kept a grocery store in a house on
land belonging to the central, the defendants also supplying the money for
the purchase of the groceries, and that the said laborer, using the ticket,
voluntarily took some goods on credit, the price of which was deducted by
the defendants from his weekly earnings. *Held:* That such acts constitute
a violation of Act No. 91 of 1919 relative to labor contracts and that the
said Act is constitutional.

The facts are stated in the opinion.

*Messrs. Parra Capó & Torres Córdova* for the appellants.

*Mr. José E. Figueras, Fiscal,* for the appellee.

MR. JUSTICE FRANCO SOTO delivered the opinion of the
court.

In this case the lower court found the defendants, Heirs
of J. Serrallés, guilty of a violation of Act No. 91 relative
to labor contracts of March 31, 1919, and imposed upon them
a fine of $1 and the costs.

The complaint reads as follows:

"That during the week ending December 15, 1921, at the Pon-
ceña plantation in Juana Díaz, within the municipal judicial dis-
trict of Juana Díaz, P. R., the defendants, Heirs of J. Serrallés,
who are engaged in the cultivation of sugar cane and the manufac-
ture of sugar, unlawfully, wilfully and with the intention of violat-
ing the law, infringed sections 1 and 3 of Act No. 91 relative to
labor contracts of March 31, 1919, in the following manner: For
the week ending December 15, 1921, the Heirs of J. Serrallés em-
ployed the laborer Ramón Santiago to do agricultural work on a
sugar cane plantation; that during that week he earned $2.60, of
which they deducted $2.55 for goods bought at the store of Juan de

Dios Colón situated on the Ponceña plantation of Juana Díaz, such deduction appearing from the attached pay envelope corresponding to the week ending December 15, 1921, which is marked with the signature of Heirs of J. Serrallés.—The defendants have violated sections 1 and 3 of said Act No. 91, which read in part as follows: 'In all contracts entered into with laborers 'their wages shall be paid exclusively in legal tender of the United States, etc., and not otherwise.' ''

Sections 1 and 3 of the said Act, alleged to have been violated, read as follows:

"Section 1. — That in all contracts entered into with laborers their wages shall be paid exclusively in legal tender of the United States, and if by special agreement, through custom or for any other reason, the laborer should receive prior to his regular pay-day any advance payment in cash, it shall be lawful for the employer to discount such advance payment. When a labor contract stipulates that all or part of the wages shall be paid otherwise than in cash, the same shall be null so far as relates to the promise or agreement to pay wages otherwise than in legal tender of the United States."

"Section 3.—That the total amount of wages due a laborer shall be paid him in legal tender of the United States and not otherwise, at intervals not to exceed one week; *Provided*, That when a laborer is dismissed or retires from work during any day of the week, it shall be the duty of the employer to pay him on the following Saturday the amount of wages earned during the days he has worked. All payments made to a laborer by an employer on account of wages, in merchandise or otherwise than in legal tender of the United States, shall be null."

The appellants assign several errors, but they may be reduced to the following: 1st.—That the Act relative to labor contracts of March 31, 1919, is unconstitutional. 2nd.—That the evidence did not support the allegations of the complaint.

The question first raised and to be first considered is whether the Act relative to labor contracts is contrary to our Organic Act or to the Constitution of the United States.

Although the law under consideration is an innovation

in our statutes, yet as early as the fourteenth century it had been known in England, where it was prohibited to pay wages to laborers in any other form than legal tender.

In 1831 the different laws regarding the payment of wages were consolidated into a law known as the Truck Act, and although, presumably, no question is known to have been raised in England as to the constitutionality of that Act, given the system of laws of that nation the fact is that history informs us that the conditions which caused these laws to be enacted revealed that, so far as the payment of wages was concerned, the working class was considered as being in an unadvantageous situation in relation to the employers and thereupon attention was given to the regulation of the payment of such wages as a matter within the police power, which required legislation to correct an evil that was considered of public and social interest. For that reason it was not unusual that the same conditions should obtain in the United States and cause the enactment of laws more or less similar, as it became the practice for a great number of employers to maintain general supply stores and stores at or near the places where the laborers worked, and to pay their wages in whole or in part in merchandise bought at the said stores. The same has been the custom in Porto Rico. Hence it is logical to believe that laws have been enacted in several states, as well as in Porto Rico, more or less similar to the old laws of England regulating the same matter, in order to correct the same evil and prevent the situation of the laborer from becoming worse and more oppressed by their submission to something like a monopoly under which they were compelled, directly or indirectly, to receive their salaries or wages in goods which did not represent the standard value sought to be maintained by establishing the payment of such wages in legal tender. But, as is often the case, laws of a kind similar to our own must necessarily receive a different or conflicting construction in

the several states; yet, from a careful examination of the jurisprudence we have concluded that the good principles which served as a basis for the English laws have prevailed more strongly in American jurisprudence for the simple reason that if the laborers were protected under a government based upon class, title, rank and station, as the English government, the principles affecting public welfare and promoting personal happiness must bear more fruit under American institutions, which do not acknowledge class distinctions and make all men equal before the law.

A law similar to our own was enacted in West Virginia on March 7, 1891, providing that the payment of laborers' wages should be made in nothing but lawful money. Section 1 of that law reads as follows:

"1.—It shall be unlawful for any corporation, company, firm, or person engaged in any trade or business, either directly or indirectly, to issue, sell, give, or deliver, to any person employed by such corporation, company, firm, or person, in payment of wages due such laborer, or as advances for labor not due, any scrip, token, draft, check, or other evidence of indebtedness, payable or redeemable otherwise than in lawful money; and, if any such scrip, token, draft, check, or other evidence of indebtedness, be so issued, sold, given, or delivered to such laborer, it shall be construed, taken, and held in all courts and places to be a promise to pay the sum specified therein in lawful money by the corporation, company, firm, or person issuing, selling, giving or delivering the same to the person named therein, or to the holder thereof. And the corporation, company, firm, or person so issuing, selling, giving, or delivering the same shall, moreover, be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than twenty-five dollars, nor more than one hundred dollars, and, at the discretion of the court, the officer or agent of the corporation, company, or firm, or the person issuing, selling, giving or delivering the same, may be imprisoned not less than ten, nor more than thirty, days."

Section 2 reads as follows:

"2.—If any corporation, company, firm, or person shall coerce

or compel, or attempt to coerce or compel, an employe in its, their, or his employment, to purchase goods or supplies in payment of wages due him, or to become due him or otherwise, from any corporation, company, firm, or person; such first-named corporation, company, firm or person shall be guilty of a misdemeanor, and upon conviction thereof shall be punished as provided in the preceding section. And if any such corporation, company, firm, or person shall, directly or indirectly, sell to any such employe, in payment of wages due or to become due him, or otherwise, goods or supplies at prices higher than the reasonable or current market value thereof at cash, such corporation, company, firm, or person shall be liable to such employe, in a civil action, in double the amount of the charges made and paid for such goods or supplies, in excess of the reasonable or correct value in cash thereof.''

This law was attacked as unconstitutional, but the Supreme Court of that state, in the case of *State* v. *Peel Splint Coal Co.*, 36 W. Va. 805, declared the same to be constitutional. This is one of the most important cases and the decision passes upon the several questions raised by the appellant in that case as assignments of error. The Supreme Court of West Virginia held that the legislature had not transcended its inherent power to make reasonable police regulations, or violated the constitution of the State. One of the most convincing arguments in the opinion of the court is that the defendant is a corporation in the enjoyment of extraordinary privileges which enable it and similar associations to surround themselves with a vast retinue of laborers, who need to be protected against all fraudulent or suspicious devices in the payment of their wages. The court also said:

''We do not base this decision so much upon the ground that the business is affected by the public use, but upon the still higher ground, that the public tranquility and the good and safety of society demand, where the number of employes is such that specific contracts with each laborer would be improbable, if not impossible, that in general contracts justice shall prevail as between operator

and miner; and, in the company's dealing with the multitude of laborers, with whom the State has by special legislation enabled the owners and operators to surround themselves, that all opportunities for fraud shall be removed. ·

"The State is frequently called upon to suppress strikes, to discountenance labor conspiracies, to denounce boycotting as injurious to trade and commerce; and it can not be possible that the same -police power may not be invoked to protect the laborer from being made a victim of the compulsory power of that artificial combination of capital, which special State legislation has originated and rendered possible." *Id. id.* 820.

And in order to show that the statute is not class legislation, the court cited the United States Supreme Court case of *Railroad Co.* v. *Becksmith*, 129 U. S. 26, 34, in which it was held that it was not unconstitutional, as a police regulation, to require railroads to fence their tracks, although others may not be required to inclose their lands; and also that a law requiring such corporations to pay for live stock killed on the track is not an unwarranted exercise of police power. Taking these conclusions as a basis, the Supreme Court of West Virginia went on to say:

"If such legislation, directed against one class of corporations only, is ·not objectionable as class legislation, it is difficult to see why laws directed against other corporations, and directly intended to prevent popular disturbance and discontent, by regulating the manner of weighing coal, and prohibiting what is popularly known as the 'pluck-me' method of payment, should not be deemed a legitimate exercise of the police power of the State." *Id. id.* 821.

Prior to the Act of 1891, some sections of which have been quoted, other police regulations have prohibited the employment of females and minors under twelve years of age. · This legislation was followed up by the Act of 1887, which applied only to persons, firms, and corporations or associations engaged in mining or any kind of manufacturing, but not to any other class or classes of persons. One of the sections of that act prohibited the issuance of any order

or other paper whatsoever for the payment of labor, unless
it purported to be redeemable for its face value in lawful
money of the United States. This section was indeed
pronounced unconstitutional in the case of *State* v. *Goodwill*,
33 W. Va. 179. The reason that the court gave for this
pronouncement was the repugnant distinction of the law in
singling out owners and operators of mines and manu-
facturers of every kind, imposing upon them burdens not
imposed on others; but in discussing the new Act of 1891
under consideration in *State* v. *Peel Splint Coal Co.*, *supra*,
the objections presented in the former case were held to
have disappeared and the following was said in the opinion:

"In the act which we are now considering this objection is
carefully and entirely removed, as will be seen by inspection of
section 1, c. 76, Acts 1891, wherein it is provided that it shall be
unlawful for any corporation, company, firm, or person engaged
in any trade or business to issue to employes, in payment of wages,
any script, token, draft, check, or other evidence of indebtedness,
payable or redeemable otherwise than in lawful money." *Id. id.*
822.

In Indiana the law required mine owners to pay the
wages of laborers every two weeks in lawful money of the
United States. That law was held to be constitutional in
the case of *Hancock* v. *Yaden*, 121 Ind. 366. One of the most
important points of the opinion of the court is the following:

"'Our judgment is that the provision of the statute forbidding
the execution of contracts, waiving a right to payment in money,
is one that the legislature had power to enact.' On page 369,
121 Ind., and page 254, (23 N. E. Rep.) the court gives its reason
for this opinion, covering substantially the ground we have gone
over. In conclusion the court says:

"'The statute operates on both the employer and employe. It
may, it is true, in its practical operation, especially benefit the wage
earner; that is no fault. At all events, the fault is not such a grievous
one as to compel the courts to strike it down. It fixes no price on any
man's labor. It leaves the parties to do that. But it does require

them to refrain from contracting, before the relation of employer and employe begins, for payment in anything except the lawful money of the United States. It does not preclude parties from making an accord and satisfaction after wages have been earned and services rendered, although it does command that the antecedent contract shall not provide that payment may be made in some other thing than lawful money of the nation.' " *Id. id.* 825-26.

A similar law was enacted in the State of Maryland and the jurisprudence has laid down the same rule as in the cases we have examined. In the case of *Shaffer* v. *Mining Co.*, 55 Md. 74, the law is upheld, the court expressing itself as follows:

"It being considered that the legislature, when it incorporated the Union Mining Company, reserved the right to alter or amend its charter at pleasure, there can be no doubt that the legislature could enact a law prohibiting the corporation from paying its employes otherwise than in money, and that it could forbid the corporation from making contracts with them for payment in anything but money."

It is true that in Pennsylvania a similar law was declared unconstitutional, as appears from the case of *Godcharles* v. *Wigeman*, 113 Pa. St. Rep. 431, but aside from the fact that this decision did not hold the law to be contrary to the Federal Constitution, but rested upon a peculiar provision of the constitution of that State, afterwards the Pennsylvania legislature passed a law prohibiting altogether mining or manufacturing companies from carrying on "company stores" or "general supply stores" where any goods or merchandise were sold, other than those mined or manufactured by themselves. Laws of 1891, p. 256.

Tennessee and Virginia have enacted laws similar to those mentioned and they have been held constitutional not only by their respective supreme courts, but also on appeal by the Supreme Court of the United States. *Knoxville Iron Co.* v. *Harbin,* 183 U. S. 13, and 58 U. S., L. ed. 1288.

The facts in this case show that Román Santiago was a laborer who was working at the factory of the defendants for weekly wages; that the custom of the defendants was to give the laborers tickets which were punched every day to show the time the laborer had worked and the amount he had earned.  It also appears from the evidence that a certain Juan de Dios Colón nominally kept a grocery store in a house and on land belonging to the defendants who also supplied the money for the purchase of the stock, and that at the said store the said Ramón Santiago, using the said ticket, voluntarily bought some goods and the amount was deducted by the defendants from his weekly earnings.  In this instance Santiago had earned $2.65 during the week and bought goods at the store amounting to $2.60, receiving, therefore, the difference of five cents in money.  It does not appear that the original ticket was attached to the record, but the record contains an envelope of the factory on the outside of which the total amount of the wages and that of the deduction may be seen.

The point, therefore, from the acts charged, is not whether the laborer has been coerced to purchase goods at the stores maintained by the defendants by using the ticket of the factory which was punched to show the time the laborer had worked and the amount he had earned.

The law assumes that these acts are voluntary and as such prohibits them so as to avoid that fraud may be committed, directly or indirectly, in reducing the wages so hardly earned by the laborer, and to reestablish the freedom of contracting by putting the laborer in a condition to spend his wages where he may obtain the best values for his money.

The appellants, however, allege that the ticket informs the laborer that he is entitled to receive the amount of his wages in cash.  But aside from the fact that the ticket is not before us, and that, as the appellants allege, it could

only be redeemed in money at the store of the factory, our law seems to be more rigid in its provisions as compared with the laws which we have examined, and we find nothing contrary to the authority of the Legislature of Porto Rico to establish the prohibition contained in section 3 of the Act relative to labor contracts, *supra,* as a regulation within the police power which could in no way impair the constitutional principle of freedom of contracting. If it should he held that this principle has been affected, this would amount to denying the authority of legislative bodies to establish the nature and effects of contracts, to make some lawful, others invalid, and to entirely prohibit others. On the contrary, that power has always been recognized. Our statutes contain provisions prohibiting contracts in which the rate of interest is usurious and it is so considered when it exceeds 12 per cent per annum. Our statutes prohibit mutual sales between husband and wife and neither of them can dispose of his community property without the express consent of the other. For the prevention of fraud it is provided that fraud shall make contracts void. And similarly our statutes contain provisions in connection with the nature and validity of contracts. We see, therefore, no difference between these statutes and the prohibition of the Act relative to labor contracts, in so far as the power of the Legislature is concerned, for the purpose of all is to destroy every opportunity for fraud, that being a proper exercise of the police power, and also because, as held by this Court in *People* v. *Porto Rican American Tobacco Co.,* 30 P. R. R. 739, ''Each workman is the owner of and should receive all that he earns, without being subject to outside pressure which may compel him to relinquish a part of his wages involuntarily, and in order to accomplish this purpose and enforce the spirit of the law, the prohibition imposed therein had to he, as it was, general and absolute.''

For the foregoing reasons the judgment must be

*Affirmed.*

Chief Justice Del Toro and Justices Aldrey and Hutchison concurred.

Mr. Justice Wolf dissented.