EL PUEBLO, DEMANDANTE Y APELADO, *v.* SUCESIÓN SERRALLÉS, ACUSADA Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de Ponce en causa por infracción a la Ley número 91 de 1919 sobre contrato de trabajo.

No. 1977.—Resuelto en abril 17, 1923.

TRABAJO—PAGO DE SALARIOS A LOS OBREROS—CONSTITUCIONALIDAD DE LA LEY SOBRE CONTRATO DE TRABAJO.—En el presente caso la prueba demuestra que el obrero trabajaba con la denunciada por un jornal pagadero semanalmente; que era costumbre de la acusada entregar tickets a los trabajadores, los que eran taladrados diariamente, significando el taladro el tiempo que había trabajado el obrero y las cantidades que tenía devengadas; que un tal Juan de Dios Colón mantenía nominalmente una tienda de provisiones en terreno y casa de la central, toda vez que la acusada era la que además facilitaba el dinero para la compra de provisiones y en dicha tienda el obrero citado, haciendo uso del ticket ya referido, voluntariamente tomó cierta cantidad de provisiones, cuyo importe le fué descontado por la acusada del semanal que había ganado por su trabajo. *Se resolvió:* que tales hechos constituyen una violación de la Ley num. 91 de 1919 sobre contrato de trabajo, cuya constitucionalidad se declara por el Tribunal Supremo.

Los hechos están expresados en la opinión.

Abogados de la apelante: *Sres. Parra Capó & Torres Córdova.*

Abogado del apelado: *Sr. José E. Figueras, Fiscal.*

EL JUEZ ASOCIADO SR. FRANCO SOTO, emitió la opinión del tribunal.

En el presente caso la corte inferior declaró culpable a la acusada "Sucesión de J. Serrallés," por infracción de la Ley núm. 91 sobre contrato de trabajo, promulgada en marzo 31 de 1919, imponiéndole un dólar de multa y las costas.

La denuncia tal como fué formulada, es como sigue:

"Que en la semana que terminó en Dic. 15, 1921, y en la hacienda Ponceña de Juana Díaz, del Distrito Judicial Municipal de Juana Díaz, P. R., la acusada Sucesión de J. Serrallés, que se dedica al cultivo y elaboración de caña y azúcar, respectivamente, ilegal, voluntaria, y con intención de violar la Ley, infringieron las secciones 1ª. y 3ª. de la Ley No. 91, sobre contrato de trabajo, promulgada en marzo 31, 1919, de la manera siguiente: En la semana que terminó en 15 de diciembre de 1921, la sucesión de J. Serrallés, contrató y utilizó en faenas agrícolas de caña, al obrero Ramón Santiago, quien se ganó en esa semana, la suma de $2.60 y le descontaron $2.55, importe de provisiones tomadas en el establecimiento de Juan de Dios Colón, que tiene en la hacienda Ponceña, de Juana Díaz, cuyo descuento figura en el sobre que se acompaña, timbrado con la firma Sucn. de J. Serrallés, correspondiente a la semana que terminó en diciembre 15, 1921. La acusada ha violado las secciones 1ª. y 3ª. de la referida Ley No. 91, que dicen en parte: 'en todo contrato celebrado con obreros los salarios de éstos, exclusivamente se pagarán en moneda legal de los EE. UU., etc., y no en otra forma.''

Y la ley citada, que se alega haberse infringido, en sus secciones 1ª. y 3ª. dice:

"Sección 1.—En todo contrato celebrado con obreros se pagarán los salarios de éstos, exclusivamente en moneda legal de los Estados Unidos, y si por convenio especial, por costumbre o por cualquier otro motivo percibiere, antes de la fecha regular del pago de su salario, un anticipo en metálico será legal que el patrono descuente dicho anticipo. Si en un contrato de trabajo celebrado se estipulare que todo o parte de los salarios, se pagasen en otra forma que en metálico, será nulo tal contrato en todo lo referente a la promesa o

compromiso de que se paguen los salarios en otra forma que en moneda legal de los Estados Unidos.

"Sección 3.—El total de los salarios debidos a un obrero, se le pagarán en moneda legal de los Estados Unidos y no en otra forma, a intervalos que no excederán de una semana: *Disponiéndose*, que cuando un obrero sea retirado o tenga que retirarse del trabajo durante cualquier día de la semana, será obligación del patrono hacerle efectivo el próximo sábado el importe del número de días trabajados. Todo pago de salarios hecho a un obrero por el patrono mediante mercancías o en otra forma que no sea en moneda legal de los Estados Unidos, será nulo."

La apelante hace la asignación de varios errores pero todos se reducen a sostener: 1°., que la ley sobre contrato de trabajo promulgada en 31 de marzo de 1919 es inconstitucional; y 2°., que la prueba no sostenía las alegaciones de la denuncia.

La cuestión en primer lugar envuelta y que debemos considerar es si la ley sobre contrato de trabajo es contraria a nuestra Acta Orgánica o a la Constitución de los Estados Unidos.

Aunque la legislación que se discute representa una innovación en nuestros estatutos, ella ya había sido conocida en Inglaterra desde el siglo 14, estableciéndose la prohibición del pago de los salarios a obreros en ninguna forma de pago que no fuera en moneda de curso legal.

En 1831 se hizo la consolidación de las diferentes leyes sobre el pago de salarios bajo lo que se conoce con el nombre de *Truck Act;* y si bien, por supuesto, no se ha conocido que ninguna cuestión ha existido en Inglaterra en cuanto a la constitucionalidad de dicha acta, dado el sistema de leyes en aquella nación, es lo cierto que la historia nos dice que los hechos que dieron lugar a dichas leyes demos-traron que la clase trabajadora, en cuanto al pago de sus salarios, fué considerada en una situación desventajosa en relación con los patronos, y entonces se consideró la regulación del pago de tales salarios como materia propia del poder

de policía, el cual exigió la necesidad de legislar para corregir un mal que se consideró de interés público y social. En tal sentido, no era de extrañar que los mismos hechos se repitieran y que se originara una legislación más o menos parecida en los Estados Unidos con motivo de que llegó a ser habitual de que un gran número de patronos mantuvieran almacenes generales y tiendas en o cerca del lugar en donde los obreros trabajaban y a quienes se les pagaba sus salarios en todo o en parte en mercancías tomadas en dichos establecimientos. Y esto mismo ha ocurrido en Puerto Rico. De aquí es lógico pensar que surgieran leyes de diferentes Estados, incluso Puerto Rico, más o menos similares a las antiguas leyes de Inglaterra, sobre la misma materia, para corregir el mismo mal e impedir que la situación de los trabajadores se hiciera de peor condición y más angustiosa, sometiéndolos a una especie de monopolio en el sentido de obligarles de un modo directo o indirecto a percibir sus salarios o jornales en artículos que no representan el tipo legal (*standard value*) de lo que se trata de sostener estableciendo la moneda de curso legal para el pago de los mismos. Pero, como ocurre con frecuencia, las leyes de caracteres semejantes a la nuestra, habían de suscitar interpretaciones diversas y opuestas en los tribunales de los diferentes Estados, pero de un estudio cuidadoso que hemos hecho de la jurisprudencia, nuestra conclusión es que los buenos principios que fueron la base de la legislación inglesa han prevalecido con más énfasis y fuerza en la jurisprudencia americana, por la sencilla razón de que si aun se daba protección a los obreros en un gobierno cuya estructura consistía en una diferencia de clase, títulos, rangos y procedencias, como el inglés, naturalmente que los principios que afectaban el bienestar público y persiguen la felicidad individual tenían que florecer con más vigor bajo las instituciones americanas en las que no se reconoce la distinción de clases y se proclama la igualdad de todos los hombres ante la ley.

Una ley parecida a la nuestra se aprobó en West Virginia en marzo 7 de 1891, disponiendo que el pago de los sueldos de los trabajadores no debe hacerse sino en moneda legal. La sección 1ª. de dicha ley literalmente dice:

"1. Será ilegal por parte de cualquier corporación, compañía, razón social o persona ocupada en cualquier industria o negocio, expedir, vender, dar o entregar, directa o indirectamente, a cualquier persona en el empleo de dicha corporación, compañía o razón social en pago de los sueldos que se adeudan a tal trabajador o por vía de adelantos por trabajos por hacer, cualquier certificado, ficha, giro, cheque u otra prueba de obligación que no sea pagadero o redimible en dinero legal, y en caso de que tales certificados, fichas, giros, cheques u otras pruebas de obligación fueren así expedidos, vendidos, dados, o entregados a dicho trabajador, será interpretado, tenido y considerado en todas las cortes y lugares como una promesa de parte de la corporación, compañía, razón social, o persona que expida, venda, dé o entregue los mismos, de pagar las suma especificada en ella en dinero legal a la persona mencionada en dichos documentos, o al tenedor de los mismos. Y la corporación, compañía, razón social o persona que de tal modo expida, venda, dé o entregue dichos papeles, será, además, culpable de *misdemeanor;* y al ser convicta de dicho delito multada en una suma no menor de $25 ni mayor de $100, y, a la discreción de la Corte, el funcionario o agente de la corporación, compañía o razón social, o la persona que expida, venda, dé o entregue los mismos, podrá ser encarcelada por un término no menor de diez días ni mayor de treinta."

Y la sección 2ª. dice:

"2. Si cualquier corporación, compañía, razón social o persona obligare o compeliere, o tratare de obligar o compeler, a un empleado a comprar mercancías o provisiones en pago del sueldo adeudádole, o que pudiere adeudársele de cualquier corporación, compañía, razón social o persona, será culpable de *misdemeanor*, y al ser convicta del delito será castigada como se dispone en la precedente sección. Y si cualquier corporación, compañía, razón social o persona, en pago del sueldo que adeude o pudiere adeudar a un empleado vendiere directa o indirectamente a éste mercancías o provisiones a precios más altos que los precios razonables o los precios corrientes del mercado al contado podrá obligarse en una acción civil a dicha corporación, compañía, razón social o persona a pagar doble la suma

de los cargos hechos y pagado por dichas mercancías o provisiones en exceso del valor razonable o verdadero en efectivo de las mismas.''

Esta ley fué atacada de anticonstitucional, pero la Corte Suprema de aquel Estado, en el caso de *State* v. *Peel Splint Coal Co.*, 36 W. V. 805-6, declaró la constitucionalidad de dicha ley.   Este es uno de los casos de más importancia y en él se examinan las diferentes cuestiones que la apelante presenta en ese caso como motivos de error.   La Corte Suprema de West Virginia sostiene que la legislatura, al aprobar dicha ley, no ha traspasado su poder inherente de establecer reglamentaciones razonables de policía o que ha violado la constitución del Estado.   Uno de los razonamientos más convincentes en la opinión de la corte es que el demandado es una corporación que disfruta de extraordinarios privilegios, que le permiten a ella y a sus asociaciones similares de rodearse de un vasto número de trabajadores contratados, quienes necesitan ser protegidos contra todo plan fraudulento o sospechoso en el pago de sus salarios.   Se dice, además:

''No fundamos esta decisión tanto en el hecho de que el negocio queda afectado por el uso público como en el motivo más poderoso de que la tranquilidad pública y el bien y la seguridad de la comunidad exigen, cuando el número de empleados es tal que contratos específicos con cada trabajador sería improbable si no imposible, que en contratos generales la justicia prevalecerá en cuanto al operador y el minero; y en los arreglos de la compañía con los muchos trabajadores, con quienes el Estado, por legislación especial, ha permitido a los dueños y encargados rodearse, que se haga desaparecer toda ocasión para cometer fraude.

''A menudo se apela al Estado para suprimir huelgas, para desautorizar conspiraciones del trabajo, para oponerse al *boycott* como perjudicial a la industria y al comercio; y no hay motivo por el cual el mismo poder de policía (*police power*) no se invoque para evitar que el trabajador sea la víctima del poder opresivo de esa combinación artificial del capital que se ha originado y hecho posible por razón de una legislación especial del Estado.''   *Id. id.*, 820.

Y para demostrar que no se trata de una legislación de clase, se cita el caso de la Corte Suprema de los Estados

Unidos de *Railroad Co.* v. *Becksmith,* 129 U. S. 26, 34, en el que se sostiene que no era inconstitucional como reglamentación de policía, requerir a ferrocarriles de cercar sus vías, aunque otros no puedan ser requeridos para cercar su terreno y también que una ley requiriendo a tales corporaciones para indemnizar ganado lanar muerto en su vía no es un ejercicio injustificado del poder de policía. Y tomando como base esas conclusiones, la Corte Suprema de West Virginia continúa diciendo:

"Si no puede oponerse la objeción de legislación de clase a tal legislación que se dirige contra una clase de corporaciones solamente, es difícil comprender porque las leyes que se dirigen contra otras corporaciones y que llevan el fin directo de evitar el desorden y descontento popular, regulando la manera de pesar el carbón y prohibiendo lo que generalmente se denomina el método *pluck me* de pago, no deba considerarse como un ejercicio legítimo del poder de policía del Estado." *Id. id.* 281.

Con anterioridad a la ley de 1891, cuyas secciones hemos citado, otros reglamentos de policía habían prohibido en West Virginia el empleo de mujeres y menores de doce años. Esta legislación fué seguida por una ley (*Act* 1887) que se aplicaba solamente a personas, firmas y corporaciones o asociaciones ocupadas en minas o alguna clase de manufactura, pero no a ninguna otra clase o clases de personas. Una de las secciones de esa ley prohibía expedir ninguna orden u otra clase de papel para el pago de sueldos a menos que dicha orden o papel representara ser redimible por su valor que en sí representa en moneda legal de los Estados Unidos. Esta sección fué en verdad declarada anticonstitucional en el caso de *State* v. *Goodwill,* 33 W. Va. 179. La razón que tuvo la corte para esa declaración fué la odiosa distinción que hacía separando a los mineros y a los manufactureros del resto de la comunidad, imponiendo sobre ellos cargas que no imponía a otros; pero en el análisis de la nueva ley de 1891, que fué objeto del caso de *State* v. *Peel Splint*

*Coal Co., supra,* las objecciones en aquel caso desaparecie-
ron y en la opinión de la corte se dice:

"En la ley que ahora consideramos esta objeción se hace desapa-
recer cuidadosa y completamente como se verá en un examen de la
sección 1, c. 76, Leyes de 1891, en la cual se prescribe que será ilegal
para cualquier corporación, compañía, razón social o persona dedi-
cada a cualquier industria o negocio expedir a empleados en pago de
salarios cualquier certificado, ficha, giro, cheque u otra prueba de
obligación, pagadero o redimible en otra forma que no sea dinero
legal." *Id. id.* 822.

En Indiana la ley exige a los dueños de minas pagar a
los trabajadores cada dos semanas en moneda legal de los
Estados Unidos. El caso de *Hancock* v. *Yaden,* 121 Ind.
336, sostiene la constitucionalidad de dicha ley. Uno de los
puntos más salientes de la opinión de la corte es como sigue:

"Nuestra sentencia es que la disposición del Estado que pro-
hibe el otorgamiento de contratos, renunciando un derecho al pago
en dinero es una que la legislatura tenía facultad para poner en vi-
gor.  En la página 369, 121 Ind., y página 254 (23 N. E. Rep.) la
corte expresa sus motivos para esta opinión, los cuales comprenden
substancialmente el fundamento que hemos considerado.  En resu-
men la corte se expresa en estos términos:

"'El Estatuto produce efectos sobre ambos, el principal y el
empleado.  Es verdad que en su funcionamiento práctico pueda es-
pecialmente beneficiar al que gana un salario; esa no es ninguna
falta.  En todos los casos la falta no es tan grave que obliga a las
cortes a eliminarla.  No fija ningún precio sobre el trabajo de nin-
gún hombre.  Deja a las partes hacer eso.  Pero sí les exige que se
abstengan de contratar, antes de que la relación de patrono y em-
pleado comience, en cuanto al pago en alguna forma que no sea
en moneda legal de los Estados Unidos.  No impide a las partes el
ponerse de acuerdo después que los salarios han sido ganados y los
servicios prestados, aunque sí requiere que el contrato anterior no
dispondrá que el pago pueda hacerse en alguna otra forma que no
sea en dinero de la nación.'" *Id id.* 825.

Una ley semejante también rige en el Estado de Mary-
land y la jurisprudencia ha sostenido igual teoría que en los

casos que hemos examinado.   En el caso de *Shafter* v. *Mining Co.*, 55 Md. 74, se sostiene la ley expresándose la corte así:

"Estando admitido que la Legislatura, al incorporar a la Union Mining Co., se reservó el derecho de alterar o enmendar su carta constitutiva según le pareciera conveniente, no puede existir duda alguna de que la Legislatura pueda decretar una ley prohibiendo a la corporación pagar a sus empleados en otra forma que no sea en dinero, y que podía prohibir a la corporación celebrar contratos con ellos para pago en algo que no fuese dinero."

Es cierto que en el Estado de Pennsylvania se declaró anticonstitucional una ley análoga a las ya mencionadas y así aparece en el caso de *Gorcharles* v. *Wigeman*, 113 Pa. State Rep. 431, pero aparte que esta decisión no se funda por ser opuesta a la Constitución Federal sino que la motivó una disposición peculiar del Estado, posterior a ese caso, la Legislatura de Pennsylvania aprobó una ley prohibiendo en absoluto a las compañías mineras o manufactureras de establecer "tiendas" o "almacenes generales de provisiones" en donde ningún artículo fuese vendido a menos que no sean aquellos artículos fabricados por ellos mismos.   Leyes de 1891, p. 256.

Los Estados de Tennessee y Virginia han aprobado leyes similares a las ya mencionadas y su constitucionalidad ha sido sostenida no sólo por sus respectivas cortes supremas sino en apelación por la Corte Suprema de los Estados Unidos.   *Knoxville Iron Co.* v. *Harbin*, 183 U. S. 13 y 15 Law Ed. 1288.

Los hechos en este caso demuestran que Ramón Santiago era un jornalero que trabajaba en la central de la Sucesión demandada por un jornal pagadero semanalmente; que era costumbre de la acusada entregar tickets a los trabajadores, los que eran taladrados diariamente, significando el taladro el tiempo que había trabajado el obrero y las cantidades que tenía devengadas.   Resulta asimismo de la prueba que un tal

Juan de Dios Colón mantenía nominalmente una tienda de provisiones en terrenos y casa de la central, toda vez que la demandada era la que además facilitaba el dinero para la compra de provisiones y en dicha tienda Ramón Santiago, haciendo uso del ticket ya referido, voluntariamente tomó cierta cantidad de provisiones, cuyo importe le fué descon- contado por la acusada del semanal que había ganado por su trabajo. En este caso Santiago había devengado $2.65 durante la semana, había tomado provisiones en la tienda por valor de $2.60, recibiendo en su consecuencia la diferen- cia de cinco centavos en dinero. No aparece que se haya unido al record el ticket original, pero si un sobre de la cen- tral que en la parte externa del mismo podemos ver el jornal total y el descuento.

La cuestión, pues, de los hechos que se persiguen, no se refiere a que se haya ejercido coacción con el trabajador para obligarle a comprar en tiendas de la acusada con el ticket que expedía la central, en el que que se anotaba la canti- dad de trabajo y el jornal devengado.

La ley supone que los hechos se realizan voluntariamente, pero así realizados los prohibe para evitar que directa o in- directamente se pueda cometer fraude mermándose de algún modo el jornal del trabajador tan penosamente ganado y res- tablecer la libre contratación de poner al obrero en condicio- nes de disponer de su jornal para gastarlo donde, en virtud de la libre competencia, podría obtener un mejor precio con su dinero sonante.

Se alega, sin embargo, por la apelante, que el ticket ad- vierte al obrero que le da derecho a recibir el importe de su jornal en dinero. Pero aparte que no tenemos a la vista el ticket de referencia y el cual solamente sería redimible según alega el apelante en dinero en la tienda de la central, y no en otra parte, la ley nuestra aparece más estricta en sus tér- minos en relación con las leyes que hemos examinado y no encontramos nada que se oponga a la autoridad que tuvo la

Legislatura de Puerto Rico para establecer la prohibición que prescribe la sección 3ª. de la Ley sobre contrato de tra bajo *supra,* como regulación comprendida dentro del poder de policía, y sin que en nada pueda haber afectado el principio constitucional de la libre contratación. Si se considerara que este principio hubiera sido afectado, entonces se habría negado a las legislaturas la autoridad para declarar la naturaleza y efectos de los contratos, a legalizar algunos y a invalidar o prohibir enteramente otros. Tal poder ha sido, por el contrario, siempre reconocido. En nuestros estatutos tenemos disposiciones que prohiben el contrato que fija un interés usurario y se considera tal cuando excede de más del 12% anual. En ellos se prohiben las ventas recíprocas entre marido y mujer, y uno y otro no pueden disponer de sus bienes gananciales sin su mútuo y expreso consentimiento. El dolo invalida contratos con el fin de impedir el fraude, y así existen otras y parecidas declaraciones en relación con la naturaleza y validez de los contratos. No vemos, por tanto, diferencia entre esas prescripciones, en cuanto al poder de nuestra legislatura, y la prohibición que establece la ley sobre el contrato de trabajo, ya que su fin es hacer desaparecer las oportunidades para el fraude, siendo función propia del poder de policía, y porque según fué declarado por esta Corte Suprema en junio 13, 1922, en el caso de *El Pueblo* v. *Porto Rican-American Tobacco Co.,* ''cada trabajador es dueño de y debe recibir todo lo que gana sin estar sujeto a extrañas presiones que le obliguen a ceder parte de su jornal involuntariamente, y para que este propósito pudiera cumplirse y la ley no resultara ilusoria, la prohibición impuesta por la misma tenía que ser como fué general, absoluta.''

Por las razones expuestas, la sentencia debe ser confirmada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente del Toro y Aso-
ciados Aldrey y Hutchison.

El Juez Asociado Sr. Wolf disintió.