| 33 | 179 |
|----|-----|
| 33 | 189 |
| 33 | 191 |
| 33 | 179 |
| 36 | 822 |
| 36 | 857 |
| 33 | 179 |
| 41 | 24 |
| 33 | 179 |
| 50 | 616 |

</div>

# CHARLESTON.

## STATE v. GOODWILL.

Submitted September 13, 1889.—Decided November 18, 1889.

### STATE v. MINOR.

Submitted June 10, 1889.—Decided November 18, 1889.

*(GREEN, JUDGE, Absent.)

1. CONSTITUTIONAL LAW—REGULATION OF PRIVATE BUSINESS—POLICE POWER.

   It is not competent for the legislature, under the constitution, to single out owners and operators of mines and manufacturers of every kind, and provide that they shall bear burdens not imposed on other owners of property or employers of labor, and prohibit them from making contracts which it is competent for other owners of property or employers of labor to make. Such legislation can not be sustained as an exercise of the police power.

2. CONSTITUTIONAL LAW.

   The third section of chapter 63, Acts 1887, (Code 1887, p. 983) which prohibits persons engaged in mining and manufacturing from issuing for the payment of labor any order or paper, except such as is specified in the said act, is unconstitutional and void.

*Henritze & Haythe, C. W. Smith, J. W. St. Clair*, and *Brown & Jackson* for plaintiffs in error.

*Attorney General Alfred Caldwell* for the State.

SNYDER, PRESIDENT:

These two cases present the same questions, and may, therefore, be considered together. The first is a writ of

---

*On account of illness.

error to a judgment of the Circuit Court of Mercer county, pronounced on April 3, 1889; and the second is a writ of error to a judgment of the Circuit Court of Fayette county, pronounced September 29, 1887. Both are indictments and convictions for the violation of section 3 of chapter 63, Acts 1887. See Code 1887, p. 963.

The title of said act is as follows: "An act to secure to operatives and laborers engaged in and about mines, manufactories of iron and steel, and all other manufactories, the payment of their wages at regular intervals, and in lawful money of the United States." And the first and third sections are in these words: "(1) That all persons, firms, corporations, or associations in this State, engaged in mining coal, ore, or other minerals, or mining and manufacturing them, or either of them, or manufacturing iron or steel, or both or any other kind of manufacturing, shall pay their employes as provided in this act." "(3) That it shall not be lawful for any person, firm, company, corporation, or association engaged in the business aforesaid, their clerk, agent, officer, or servant, in this state, to issue for the payment of labor any order or other paper whatsoever unless the same purports to be redeemable, for its face value, in lawful money of the United States, bearing interest at the legal rate, made payable to employe or bearer, and redeemable within a period of thirty days by the person, firm, company, corporation, or association giving, making, or issuing the same." The residue of the section makes its violation a misdemeanor, and fixes the penalty at not less than $25.00, or more than $100.00.

There was a demurrer to each of the indictments, which was overruled by the court; and the plaintiffs in error assign this as ground for the reversal of the judgments.

The main question argued before this Court is whether or not the said statute is constitutional, the counsel for the plaintiffs in error contending that it is unconstitutional and void, and the Attorney-General insisting that it is a proper exercise of the police power, and therefore not unconstitutional and void.

It will be observed that this statute applies to certain specified classes of persons, firms, companies, corporations

and associations and none others. It is by its terms limited to persons, corporations, *etc.*, engaged in mining coal or other minerals, or any kind of manufacturing. While these terms include not only all persons engaged in mining coal and other minerals, and all persons engaged in manufacturing iron and steel, but also all persons engaged in any kind of manufacturing, such as the shoe-maker, the cigar-maker, the undertaker, the distiller, the brick-maker, the jeweler, the weaver, the milliner, the dairyman and the miller, it does not include the wholesale merchant with his hundreds of clerks and agents; the railroad construction companies, or railroad companies with their thousands of employes. The propriety or the necessity, if such exists, of applying the provisions of the statute to these latter is equally as great, if not greater, as it is to any of the former. The rights and privileges of certain specified employers are abridged, while others of the same class are left free.

By the first section of the fourteenth amendment of the constitution of the United States all persons born or natu-ralized in the United States are made citizens thereof; and it then declares that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." And the "bill of rights" of this State declares that "all men are, by nature, equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they can not by any compact deprive or divest their posterity; namely, the enjoy-ment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety." Const. art. III, § 1. Can the legislature, in view of these constitutional guarantees, limit or forbid the right of contract between parties under no mental, corporal, or other disability, when the subject of contract is lawful, not public in its character, and the exercise of it is purely private and personal to the parties themselves?

The court, in *People* v. *Gillson*, says: "The term 'liberty,' as used in the constitution, is not dwarfed into mere freedom from physical restraint of the person of the citizen, as by incarceration; but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has

been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. Liberty, in its broad sense, as understood in this country, means the right, not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation." 109 N. Y. 398 (17 N. E. Rep. 343): FIELD, J., in *Butchers' Union Co.* v. *Crescent City, etc., Co.,* 111 U. S. 755 (4 Sup. Ct. Rep. 652); *Association* v. *Crescent City Co.,* 1 Abb. (U. S.) 398.

The court in Civil Rights Cases, says: "Under the fourteenth amendment, it (congress) has power to counteract and render nugatory all State-laws and proceedings which have the effect to abridge any of the privileges or immunities of citizens of the United States, or to deprive them of life, liberty, or property without due process of law, or to deny to any of them the equal protection of the laws. * * * Many wrongs may be obnoxious to the prohibitions of the fourteenth amendment which are not, in any just sense, incidents or elements of slavery. Such, for example, would be the taking of private property without due process of law; or allowing persons who have committed certain crimes (horse-stealing, for example) to be seized and hung by the *posse comitatus,* without regular trial; or denying to any person, or class of persons, the right to pursue any peaceful avocation allowed to others. What is called 'class legislation' would belong to this category, and would be obnoxious to the prohibitions of the fourteenth amendment." 109 U. S. 23 (3 Sup. Ct. Rep. 18).

The rights of every individual must stand or fall by the same rule of law that governs every other member of the body politic under similar circumstances; and every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by restricting the privileges of certain classes of citizens and not of others, when there is no public necessity for such discrimination, is unconstitutional and void. Were it otherwise, odious individuals or corporate bodies would be governed by one law, and the mass of the community, and those who make the

law, by another; whereas, a like general law, affecting the whole community equally, could not have been enacted. *Wally* v. *Kennedy*, 2 Yerg. 554.

The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. · The patrimony of the poor man lies in the strength and dexterity of his own hands; and to hinder him from employing these in what manner he may think proper, without injury to his neighbor, is a plain violation of this most sacred property. It it is equally an encroachment both upon the just liberty and rights of the workman and his employer, or those who might be disposed to employ him, for the legislature to interfere with the freedom of contract between them, as such interference hinders the one from working at what he thinks proper, and at the same time prevents the other from employing whom he chooses. A person living under the protection of this government has the right to adopt and follow any lawful industrial pursuit, not injurious to the community, which he may see fit. And, as incident to this, is the right to labor or employ labor, make contracts in respect thereto upon such terms as may be agreed upon by the parties, to enforce all lawful contracts, to sue, and give evidence, and to inherit, purchase, lease, sell, and convey property of every kind. The emjoyment or deprivation of these rights and privileges constitutes the essential distinction between freedom and slavery; between liberty and oppression. These principles have been fully recognized and announced in many decisions of the Supreme Court of the United States, and other courts. *Yick Wo* v. *Hopkins*, 118 U. S. 356 (6 Sup. Ct. Rep. 1064); *Slaughter-House Cases*, 16 Wall. 36; *Butchers' Union Co.* v. *Crescent City, etc., Co.*, 111 U. S. 746 (4 Sup. Ct. Rep. 652); 6 Myer Fed. Dec. § 1000 ; *In re Jacobs*, 98 N. Y. 98; *People* v. *Marx*, 99 N. Y. 377 (2 N. E. Rep. 29); *Ex parte Westerfield*, 55 Cal. 550; *Ragio* v. *State*, 86 Tenn. 272 (6 S. W. Rep. 401); *State* v. *Divine*, 98 N. C. 778 (4 S. E. Rep. 477).

The vocation of an employer, as well as that of his employe, is his property. Depriving the owner of property of one of its attributes is depriving him of his property, under

the provisions of the constitution. *People* v. *Otis*, 90 N. Y. 48. The right to use, buy, and sell property, and contract in respect thereto, including contracts for labor— which is, as we have seen, property—is protected by the constitution. If the legislature, without any public necessity, has the power to prohibit or restrict the right of contract between private persons in respect to one lawful trade or business, then it may prevent the prosecution of all trades, and regulate all contracts. "Questions of power," says MARSHALL, C. J., in *Brown* v. *Maryland*, 12 Wheat. 419, "do not depend on the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed."

No one questions the position that, unless the government intervened to protect property and regulate trade, property would cease to exist, and trade would exist only as an engine of fraud; but this does not authorize the government to do for its people what they can do for themselves. The natural law of supply and demand is the best law of trade. In *Munn* v. *Illinois*, 94 U. S. 113, and other cases involving the same questions, the Supreme Court of the United States has held that persons or corporations engaged in occupations in which the public have an interest or use may be regulated by statute. But the reasons assigned for these decisions are that the public has a use in these occupations, and that the persons engaged in them are in the exercise of a public franchise, or special privileges, not enjoyed by others not so engaged; that their business implies a trust and public duty; and that the government has, therefore, the power to see that this trust is not abused, and that the duty imposed by it is properly performed. On this principle, statutes have been upheld which regulate the charges of railroad companies and other common carriers; elevator, telephone, telegraph, and other companies; hackmen, warehousemen, owners of water-mills, *etc.* But we are aware of no well-considered case in which a statute has been upheld that undertook to regulate the dealings between employer and employe, even in this class of occupations; much less in cases that are not impressed with a public trust or duty.

But the claim is made that the legislature should pass the act now in question in the exercise of the police power which every sovereign state possesses. That power is very broad and comprehensive, and is exercised to promote the health, safety, and welfare of society. Its exercise in extreme cases is frequently justified by the maxim *salus populi suprema lex est.* It is used to regulate the use of property by enforcing the rule, *sic utere tuo, ut alienum non lædas.* Under it the conduct of an individual and the use of property may be regulated so as to interfere, to some extent, with the freedom of the one and the enjoyment of the other; and in cases of great emergency, engendering overruling necessity, property may be taken or destroyed without compensation. The limit of the power can not be accurately defined; and the courts have not been willing definitely to circumscribe it. But this power, however broad and extensive, is not above the constitution, which is the supreme law; and, so far as it imposes restraints, the police power must be exercised in subordination to it. *In re Jacobs,* 98 N. Y. 98; Cooley, Const. Lim. 719; *Mugler* v. *Kansas,* 123 U. S. 623 (8 Sup. Ct. Rep. 273).

Generally it is for the legislature to determine what laws and regulations are proper in the exercise of the police power; but if it passes an act ostensibly for the public health or safety, and thereby destroys or takes away the property of a citizen, or interferes with his rights or personal liberty, then it is for the courts to determine whether it is a proper and reasonable exercise of the power, and, if it is not, to declare it void. *Austin* v. *Murray,* 16 Pick. 121; *State* v. *Gilman, ante,* p. 146.

The right to regulate the rate of interest existed at the time the constitution was adopted, and can not, therefore, be considered as either an abridgement or restraint upon the rights of the citizen guarantied by the constitution. The power to pass usury laws exists by immemorial usage; but such is not the case with such acts as we are now considering. *Munn* v. *Illinois,* 94 U. S. 113, 153.

Our act is almost a literal copy of an act passed by the legislature of Pennsylvania on June 29, 1881. Laws Pa. 1881, p. 147. In *Godcharles* v. *Wigeman,* 113 Pa. St. 431,

(6 Atl. Rep. 354), the Supreme Court of that State declared the first four sections of that act unconstitutional and void. The Court, in its opinion, says: "The first, second, third, and fourth sections of the act of June 29, 1881, are utterly unconstitutional and void, inasmuch as by them an attempt has been made by the legislature to do what, in this country, can not be done; that is, prevent persons who are *sui juris* from making their own contracts. The act is an infringement alike of the rights of the employer and the employe. More than this, it is an insulting attempt to put the laborer under a legislative tutelage, which is not only degrading to his manhood, but subversive of his rights as a citizen of the United States. He may sell his labor for what he thinks best, whether money or goods, just as his employer may sell his iron or coal; and any and every law that proposes to prevent him from so doing is an infringement of his constitutional privileges, and consequently vicious and void."

In *Millet* v. *People*, 117 Ill. 294, (7 N. E. Rep. 631) the Supreme Court of Illinois, in a well considered opinion, held unconstitutional and void an act of the legislature of that state which required the owners or operators of mines to provide scales for weighing their coal, and make the weight of coal the basis of the wages of miners. A part of the syllabus is as follows: "It is not competent for the legislature, under the constitution, to single out owners and operators of coal mines, and provide that they shall bear burdens not imposed on other owners of property or employers of labor, and prohibit them from making contracts which it is competent for other owners of property or employers of labor to make. Such legislation can not be sustained as an exercise of the police power."

In view of what the courts have uniformly held in respect to this class of legislation, it is needless to prolong this discussion. It is a species of sumptuary legislation which has been universally condemned, as an attempt to degrade the intelligence, virtue, and manhood of the American laborer, and foist upon the people a paternal government of the most objectionable character, because it assumes that the employer is a knave, and the laborer an imbecile.

"Such legislation," as is well said by the Court, *In Re Jacobs*, 98 N. Y. 114, "may invade one class of rights to-day and another to-morrow; and, if it can be sanctioned under the constitution, while far removed in time, we will not be far away in practical statesmanship from those ages when governmental prefects supervised the building of houses, the rearing of cattle, the sowing of seed, and the reaping of grain, and governmental ordinances regulated the movements and labor of artisans, the rate of wages, the price of food, the diet and clothing of the people, and a large range of other affairs long since, in all civilized lands, regarded as outside of governmental functions. Such governmental interferences disturb the normal adjustments of the social fabric, and usually derange the delicate and complicated machinery of industry, and cause a score of ills while attempting the removal of one."

For the reasons aforesaid, we are clearly of opinion that the said third section of the act aforesaid is unconstitutional and void. In arriving at this conclusion, we have not been unmindful that the power of the courts to condemn legislative acts as unconstitutional is one of great delicacy, and to be exercised with extreme caution, and even with reluctance. But, as said by Chancellor Kent, (1 Kent. Comm. 450) "it is only by the free exercise of this power that courts of justice are enabled to repel assaults and protect every part of the government, and every member of the community, from undue and destructive innovations upon their charter rights."

The statute itself being, as we have seen, unconstitutional and void, there could be no valid indictment founded upon it; and consequently the Circuit Court erred in overruling the demurrer to the indictment in each of these cases; and for that reason the judgments of the Circuit Court are reversed, and the defendants discharged.

REVERSED.