101 S.E.2d 425 (1957)
STATE of West Virginia
v.
MEMORIAL GARDENS DEVELOPMENT CORPORATION.
No. CC837.
Supreme Court of Appeals of West Virginia.
Submitted September 11, 1957.
Decided December 3, 1957.
Dissenting Opinion January 14, 1958.
*426 W. W. Barron, Atty. Gen., Virginia Mae Brown, Asst. Atty. Gen., for plaintiff.
Hale J. Posten, Robert T. Donley, Morgantown, Edward D. Hansen, Kansas City, Mo., for defendant.
DUCKER, Judge.
The plaintiff, State of West Virginia, instituted this suit against the defendant, Memorial Gardens Development Corporation, a West Virginia corporation, in the Circuit Court of Monongalia County, seeking to enjoin the defendant from violating the provisions of Chapter 153 of the Acts of the Legislature of West Virginia, Regular Session, 1955, (Michie's Code 47-14). Defendant filed its answer and cross bill to which plaintiff demurred. The court overruled plaintiff's demurrer to defendant's answer and cross bill, and upon the joint application of the parties certified to this Court for determination the question of the correctness of the decision by the Circuit Court holding in effect that the statute under which the plaintiff seeks relief is invalid and unconstitutional.
The plaintiff in its bill of complaint alleges that the defendant is engaged, among other activities, in the sale of pre-need burial merchandise, interment spaces and services under a form of contract, specifically set out as an exhibit to the bill, in violation of the provisions of Chapter 153 of the Acts of the Legislature of West Virginia, Regular Session, 1955, by neglecting and refusing to comply with the provisions of said Act by not depositing the money paid to defendant in a bank, trust company or savings and loan association authorized to do business in this state, and that defendant plans to continue in the future so to violate the provisions of that statute.
The provisions of said statute insofar as the same are pertinent to this decision are as follows:
"[Section 1.] Pre-need Contracts Against Public Policy.Any agreement, contract or plan requiring the payment of money in a lump sum or installments which is made or entered into with any person, association, partnership, firm or corporation for the final disposition of a dead, human body, or for funeral or burial services, or for the furnishing of personal property or funeral or burial merchandise, wherein the delivery of the personal property or the funeral or burial merchandise or the furnishing of professional services by a funeral director or embalmer is not immediately required, is hereby declared to be against public policy and void, unless all money paid thereunder shall be paid to and held by a bank, trust company, or savings and loan association, insured by an agency of the federal government, and which is authorized to do business in this state, and subject to the terms of an agreement for the benefit of the purchaser of said agreement, contract or plan.
"[Sec. 2.] All Money Paid on Pre-need Contracts to Be Deposited within Ten Days.All such money shall be deposited with such bank, trust company or savings and loan association, within ten days of payment, and shall be held by such bank, trust company or savings and loan association in a separate account in the name of the funeral director, embalmer or supplier of said merchandise and services under said agreement, contract or plan, as trustee for the purchaser until said fund is released as herein provided.
"[Sec. 3.] Funds Shall Remain on Deposit unless Withdrawn by Purchaser.All payments made under said agreement, contract or plan and any earnings or interest thereon shall remain with such bank, trust company or savings and loan association until the death of the person for whose service the funds were paid: Provided, however, That said funds shall be released to the purchaser of the merchandise or services under said agreement, *427 contract or plan, who shall be entitled to receive the same, at any time, upon demand upon said bank, trust company, or savings and loan association, and upon three days' notice to the other party to the agreement. The funds deposited shall not be partially withdrawn at any time by the purchaser, but shall be entirely withdrawn, if withdrawn at any time before the completion of the agreement or contract.
"[Sec. 4.] Payment of Funds by Bank, Trust Company or Savings and Loan Association.If any balance remains in said account upon the death of the purchaser, the same shall not be paid by such bank, trust company or savings and loan association, to the trustee until the expiration of at least five days after the death of the purchaser for whom such funds were deposited. Such funds shall not be paid by said bank, trust company or savings and loan association until a certified copy of the death certificate of such person shall have been furnished to said bank, trust company or savings and loan association. The payment of such funds and accumulated interest pursuant to sections three or four [§§ 4679(23) or 4678(24)] of this article shall relieve the bank, trust company or savings and loan association of any further liability for such funds or interest. Any balance remaining in said fund after payment for the merchandise and services as set forth in said agreement, contract or plan shall inure to the benefit of the estate of the purchaser or under said agreement, contract or plan, and shall be paid over to the estate by the trustee, aforesaid.
"[Sec. 5] Provisions of this Article Cannot Be Waived by Contract.Any provision of any such agreement or contract whereby a person who pays money under or in connection therewith waives any provision of this article shall be void.
"[Sec. 6] Article not Applicable to Sale of Lots or Graves.This article shall not apply to the sale of lots or graves by a cemetery."
The statute also makes violation of it a misdemeanor and authorizes injunction proceedings to prohibit violations.
The answer and cross bill of the defendant admits the factual allegations in the plaintiff's bill of complaint to the extent that it has entered into contracts with many persons in the Morgantown area under a plan known as the "Gold Cross Plan", which contracts are sales on a pre-need basis of interment spaces, burial vaults, memorial markers and certain services in connection with interments, but that it does not contract for caskets or embalming services or the services of a funeral director. And defendant says that it has so engaged in such business in the belief that such statute is invalid and unconstitutional, that it has not and cannot comply with the provisions of said statute relating to the deposit of the proceeds of such contracts in a trust fund as required by said statute, and if so required, it will be compelled to cease doing business. Defendant further says that under its West Virginia corporate charter, it is authorized to own and operate a cemetery and to buy, sell and deal in personal property and services relating to the final disposition of human bodies; that it has expended more than $150,000 in the development of the Beverly Hills Memorial Park Cemetery at Morgantown, and to insure perpetual care of it, has deposited nearly $100,000 in an irrevocable trust in the Farmers' and Merchants' Bank of Morgantown; that by reason of the large scale upon which it does business, it is able to purchase in quantity lots and to sell to the ultimate user materials at a substantially lower price than its competitors could; that it is necessary to employ salesmen at substantial commissions; and that to effect economies in operating overhead, defendant joined with some two hundred other cemeteries located in twenty-two states in a central accounting office in Kansas City Missouri, *428 and as rapidly as becomes proper under the contracts, individual trust accounts for the purchasers are set up in the City National Bank & Trust Company of that city. And the defendant further alleges that between the time that it commenced sale of Gold Cross Plan contracts in 1954 and the effective date of the statute under consideration in June, 1955, it entered into four hundred and forty-eight individual contracts involving in the aggregate some $98,000, of which contracts twenty-three have been completed by deliveries of the merchandise sold; that the defendant has never defaulted, its customers are satisfied, that if by the statute the defendant is required to deposit in trust all of the proceeds of any pre-need contract until a rescission by, or until the death of, the other contracting party, it is impossible for the defendant to continue in business.
The defendant alleges, by way of its cross bill, that the statute hereinbefore set forth is invalid and unconstitutional in that it is a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution in that it sets apart a particular method of transacting a lawful business by a particular group of citizens and imposes upon this group and this method of business restrictions amounting to a prohibition, that the statute is in violation of the due process clauses of both the Constitutions of the United States and the State of West Virginia, in that it confiscates not only its property rights but also its freedom of contract, and also impairs the obligation of the contracts made prior to its enactment, and is an ex post facto law attempting to reform pre-existent contracts; and that the statute is an arbitrary confiscation of private property and an unwarranted exercise of the police power of the state. And defendant prays for an injunction and order restraining plaintiff from enforcing the statute.
By the demurrer of the plaintiff to the defendant's answer and cross bill the plaintiff contends that the statute is not an unwarranted exercise of the police power, is not a taking of property without due process of law, does not impair the obligation or abridge the freedom of contract, is not discriminatory class legislation or an ex post facto law, and is valid and constitutional, and by overruling this demurrer the court held the statute unconstitutional, and certified the single question of its constitutionality for this Court to determine.
As is seen by the allegations of fact in the defendant's answer and cross bill, necessarily admitted for the purposes herein by plaintiff's demurrer, there could be separate consideration for the purpose of determining the constitutionality to be given to the validity of contracts or sales made prior to the effective date of the statute, and to contracts or sales made subsequent thereto, but if the enactment so far as it relates to the business of defendant is not within the scope of the police power and therefore invalid, then both classes of contracts are valid.
The statute declares that contracts of the nature of the one involved in the instant case are against public policy and void, apparently for the purported reason that personal property relating to burials sold presently for future delivery might tend to encourage, or lend itself to, fraud on the part of the vendors, or that there might be a failure for one reason or another on the part of the vendors to perform their obligations at the time performance is required. There is here no assertion or fact leaving an inference that there has been anything fraudulently done by the defendant.
The plaintiff in its briefs advances the argument: that the legislature can determine what measures are appropriate or needful for the protection of public morals, health and welfare; that an act of the legislature is presumed valid unless invalidity is shown beyond a reasonable doubt; that lawful business which may be so conducted as to become the medium of fraud and dishonesty, may be regulated by the state; and that regulating sales of pre-need burial *429 services and merchandise under contract is a proper exercise of the police power.
The defendant in its briefs advances the argument: that the police power of the state must be exercised within reasonable and constitutional limits; that this statute deprives defendant of its property without due process of law; that this statute discriminates against a particular mode of conducting a legitimate business, and is class legislation denying equal protection of the laws; that it impairs the obligation of private contracts; and that having criminal provisions, it is ex post facto legislation.
Except for the case of Falkner v. Memorial Gardens Association, 298 S.W.2d 934, decided by the Court of Civil Appeals of Texas on January 23, 1957, and which is based upon a statute quite similar in its provisions to the statute here involved, and in which that Court held that the statute was constitutional, there has not been cited any case specifically deciding the question here presented. In the Falkner case, the Legislature limited the provisions of its statute to the regulation of such business, requiring those desiring to engage in such business to obtain permits from the State Banking Department, which is given supervision of those so engaged. Deposit of all funds so collected was likewise required to be deposited in trust, and the insurance code of the state was made applicable. Although the Texas statute may be termed a regulatory one, it nevertheless has many of the same attributes as the statute here in question.
There are numerous cases cited in the briefs of the plaintiff embodying the exercise of the police power within constitutional limitations, and these cases deal in the main with such subjects as insurance or related risk businesses, bulk sales, food distribution or processing, and businesses which specifically involve speculation or hazards not inherent in the ordinary course of trade or business. Insurance, as we know, is based upon the payment by the insured of premiums according to the extent of coverage desired for protection against death, fire or other risk, and consequently mortality tables and risk percentages must be used for the determination of the necessary reserves to be fixed. Bulk sales laws deal with the prevention of fraud on creditors by prohibiting a debtor from selling his whole stock of merchandise upon which ostensibly he has, or could have, obtained credit, without proper notice to his creditors. The laws relating to the sale of food, its processing or distribution are clearly public health measures. The police power also extends to laws which can be otherwise classified as public welfare.
All legislation under the police power must be within the constitutional inhibitions. Milkint v. McNeeley, 113 W.Va. 804, 169 S.E. 790; Eubank v. City of Richmond, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156. Can the business of the defendant be considered as one relating to public morals, public health or public welfare, subject to the police power and not within the inhibitions of the Constitutions of the United States and the State of West Virginia?
Section 10 of Article III of the Constitution of West Virginia provides that:
"No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."
In Lawrence v. Barlow, 77 W.Va. 289, 87 S.E. 380, 381, with supporting cases cited therein, this Court said:
"`The term "liberty" as used in the Constitution, is not dwarfed into mere freedom from physical restraint of the person of the citizen, as by incarceration, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. "Liberty," in its broad sense, as understood in this country, means the right, not only of freedom *430 from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation.' People v. Gillson, 109 N.Y. 398, 17 N. E. 343. The above is quoted approvingly in State v. Goodwill, 33 W.Va. 179, 10 S.E. 285, 6 L.R.A. 621. `A person living under the protection of his government has the right to adopt and follow any lawful industrial pursuit, not injurious to the community, which he may see fit. And, as incident to this, is the right to labor or employ labor, make contracts in respect thereto upon such terms as may be agreed upon by the parties, to enforce all lawful contracts, to sue, and give evidence, and to inherit, purchase, lease, sell, and convey property of every kind. The enjoyment or deprivation of these rights and privileges constitutes the essential distinction between freedom and slavery; between liberty and oppression. These principles have been fully recognized and announced in many decisions of the Supreme Court of the United States and other courts.'"
The Fourteenth Amendment to the Constitution of the United States provides, inter alia, as follows:
"* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *"
The interpretation given to this West Virginia Constitutional provision has been likewise given to the Federal Constitutional provision, as has been expressed by the Supreme Court of the United States in the case of Coppage v. State of Kansas, 236 U.S. 1, 35 S.Ct. 240, 243, 59 L.Ed. 441, in the following language:
"Included in the right of personal liberty and the right of private property partaking of the nature of each is the right to make contracts for the acquisition of property."
And, in Baltimore & Ohio Southwestern Railway Co. v. Voigt, 176 U.S. 498, 20 S.Ct. 385, 387, 44 L.Ed. 560, the following was quoted:
"It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore, you have this paramount public policy to consider, that you are not lightly to interfere with this freedom of contract."
There is, of course, the distinction between the power of the state to regulate a business and the power to prohibit it, and in many instances the regulation is proper, for the sole reason that the nature of the business is such as will encourage fraud on the part of those engaged in it, or that fraudulent schemes or dealings are either appurtenant to its operation or so closely allied with it that the public must be protected from its dangers. And while it has been frequently said that the wisdom of the legislature shall determine the subjects coming within the police power, yet that wisdom must yield to the wisdom, as we see it, of the constitution. And so it is necessary to determine whether this class of business is of such a nature as to permit or require regulation or prohibition, or, in other words whether the sale of merchandise or services incidental to burial but not involving the embalming, cremation or other services relating to the actual interment of human bodies, is so different from other sales of merchandise as to which the public needs special protective legislation. Regulatory or prohibitory statutes *431 are not to be based on the incompetency of persons sui juris to buy and sell property or services. Many frauds are perpetuated in daily business transactions and redress therefor is civilly and criminally available to the victim. But fraud is not necessarily or reasonably imputable to the business of selling personal property or agreeing to perform services whether at present or in the future. If such were the law, every merchant could be regulated in the simple sale of his goods, and, for example, in so-called "lay-away" sales, where cash or "down" payment on a purchase is made and the seller retains the merchandise for weeks or months until the full purchase price is paid. While it may be true that the defendant's business is not that simple, yet the quantity or extent of the business conducted, or the time of performance element should not be the criterion by which legality is determined. Nor does the fact that a seller conducts part of his business and has his funds in another state give adequate reason for regulation or inhibition.
The record in this case neither alleges nor shows any fraud on the part of the defendant, but on the contrary, the answer asserts facts which indicate that defendant has a substantially sound business with a large investment in a cemetery with funds for perpetual care provided in an irrevocable trust in this State. Although plaintiff claims that the public dealing with defendant could be defrauded, such possibility should not destroy the right to contract. Fear or suspicion that one will commit fraud or resort to fraudulent practices can be leveled at any one at any time engaged in any lawful business, but we hardly see where that should be the basis for either regulation or prohibition of legitimate business. The state cannot possibly protect all its citizens against possible loss on contracts which parties make. In every contract, the contracting parties must decide for themselves whether the other contracting parties are able or will be able to fulfill the obligation assumed when performance is due. Purchasers of property or services can ascertain, if they so desire, the reputation of the sellers and their financial condition, and if they do not, it is not the fault of the state if any loss to them should ensue. We think that it is inconsistent to say that the Constitutions protect citizens in their right to contract and yet restrain them from making contracts such as the type here involved, and which type of contract, other than the classification which the statute here involved attempts to give it, has, so far as this record discloses, no other feature which could classify it as illegal.
Although it may be to some degree popular to enact, and much may be said in favor of, laws protecting the unsuspecting and incompetent in their purchases gullibly made of property for future delivery and the possibility of vendors failing for one reason or another to deliver, the provisions of the two Constitutions contemplate and provide to all citizens freedom of contract so that any legislative acts passed may not discriminate between kinds or classes of business which are considered legal. State v. Goodwill, 33 W.Va. 179, 10 S.E. 285, 6 L.R.A. 621; Marlow v. Ringer, 79 W.Va. 568, 91 S.E. 386, L.R.A.1917D 619; Koppers Coal Co. v. Compensation Commissioner, 123 W.Va. 621, 17 S.E.2d 330. Were it not for the protection thus afforded by the Constitution, any small legitimate business which could not protect itself by the vote of a majority of the legislative bodies could find itself unfairly and unjustly classified as illegal and its contracts void or its business so regulated as to destroy or impair it by reason of a simple legislative declaration to the effect that it involved a matter affecting the public morals, public health or public welfare. So the reason for the constitutional provisions, the supreme law of the land, is very obvious. It is always unfortunate to some when fair competition seriously affects one's business, but that alone affords no legitimate reason for the regulation of the competitor. Fair and legal competition is *432 generally more wholesome and beneficial to the public than otherwise, and should not be suppressed by impairing or destructive legislation.
The statute here involved which requires impounding of all purchase money has prohibitory rather than regulatory effect, because no one could without other types of business or finances afford to engage in such business which allowed no expenditure of the funds for operational expenses, but a decision on this question, as well as on the questions of impairment of the obligation of contracts and the statute being ex post facto, is unnecessary in view of our holding as hereinafter shown.
In our decision here on the question of the constitutionality of the statute as it applies to the business of the defendant, we do not hold that the business or profession of embalming and the business or profession of funeral directing are not subject to regulation under the police power of the state, as the validity of the regulation of those businesses or professions under the police power has been upheld by this Court in Quesenberry v. Estep, W.Va., 95 S.E.2d 832.
For the reasons hereinbefore contained, we are of the opinion, and so hold, that the business of the defendant is not such as warrants the enactment by the State, under the police power, of the statute in question, and that Chapter 153 of the Acts of the Legislature, Regular Session, 1955, is unconstitutional to the extent heretofore indicated, and accordingly, we affirm the ruling of the trial court and answer the certified question in the affirmative.
Ruling affirmed.
GIVEN, Judge (dissenting).
Being of the firm view that the Court, by the decision in this case, has unnecessarily and unwarrantedly struck down meritorious legislation, and thereby effectively precludes the exercise of the police power by the Legislature of the State, in a field wherein legislation is very much needed, I must attempt to state reasons for my dissent. Since the Legislatures of more than half of the States of the Union have already enacted legislation to the effect of that struck down, or very similar thereto, undoubtedly designed for the same purpose, prevention of fraud, there would seem to remain no vestige of doubt as to the need for such legislation, or as to the general welfare of the people being touched thereby.
To aid in a clear understanding of the questions involved, some of the salient facts should be mentioned. Defendant's business consists in part of the sale of "interment spaces" or burial rights in certain cemeteries, including Beverly Hills Memorial Gardens in Monongalia County. From the sale prices paid for such burial spaces, a certain percentage is deducted and deposited in a trust account, to be used solely for the beautification or maintenance of the cemetery grounds. The percentage of the purchase price to be paid into the trust account is fixed by provisions of the contract. That is the exclusive source, in so far as material to this case, of the funds deposited in such trust account. That account has no connection with, is not in any manner security for, the performance of any contract of defendant with any purchaser relating to the business of defendant attempted to be regulated by the legislation held invalid. All transactions relating to purchases of such burial spaces are, by the statute, excluded from its operation in this language: "This article shall not apply to the sale of lots or graves by a cemetery." Michie's Code, 1955, 47-14-6. Therefore, as to such part of defendant's business, no question is raised in this proceeding. These observations seem necessary to make clear that the trust fund mentioned in the majority opinion has no relation, as security or otherwise, to the moneys received by defendant from other parts of its business, those parts of its business attempted to be regulated by the Legislature.
*433 In addition to sales of burial spaces, defendant enters into contracts with purchasers whereby a purchaser "agrees to buy and the Company agrees to obtain for the benefit of and sell to the Purchaser, his heirs or assigns", certain merchandise, including burial vaults, companionate memorials, family memorials, grave markers, interment fees and perhaps other merchandise and services. For such merchandise and services the purchaser binds himself to pay a certain sum, in cash or in installments, plus such further amount as may represent any increase in the price of such merchandise or services between the date of the contract and the time of the delivery of the merchandise or the rendering of such services, and the further sum of "50¢ on each installment payment" as a "service charge". The delivery of the merchandise is to be made by defendant "upon request of the Purchaser, his heirs or assigns", provided that such request is made "after receipt of the full sum" contracted to be paid. Clearly, it is not contemplated that delivery be made or services rendered until after the death of the purchaser, as to such items as the burial vault or the interment fees, such as the "opening and closing of graves", the "use of Chapel tent, lowering device, greens, chairs, and other equipment as is usually provided by the Company for this purpose". Certain provisions of the contract permit the defendant, in certain circumstances, to substitute merchandise or services for those described in the contract. Other provisions relate to the creation of a trust fund, a trust fund different from that mentioned above, as a guaranty for the performance of the contract on the part of the seller, but all such matters as amounts or proportions of purchase prices to be placed in such trust fund, and the control and management thereof, are left to the sole decision of the company. No provision is inserted in the contract relating to the deduction of any commissions for agents, deductions for "overhead" expenses or the like, though defendant now contends that it will be unable to remain in business if not permitted to make such deductions. As to the income to be earned by the purchase money between the time of payment and the death of the purchaser, the contract provides "* * * the income therefrom to be used for the best interests of the Company, or its nominees, as its Board of Directors may determine". Of common knowledge is the fact that income from such a trust fund reaches large proportions, where held for a lifetime.
From the terms of the contract, it is clear that as to such merchandise there is no present sale; no delivery thereof is then even contemplated. The sale may be, and in most cases will be, to "heirs or assigns". The defendant only "agrees to obtain for the benefit" of the purchaser, the merchandise or substitutes therefor. At the time of the execution of the contract such merchandise is not necessarily in possession of the company, or held in storage by it. It is not necessarily in existence. It may be manufactured or purchased by defendant after "request of the Purchaser, his heirs or assigns", which request may not be made during the lifetime of the purchaser or, for that matter in some instances, never. For such period of time, as indefinite as life, the defendant possesses and controls the purchase money, removing it beyond the control of the Legislature and from the jurisdiction of the Courts of this State, with "the income therefrom to be used for the best interests of the Company", after deducting from the purchase price paid such commissions, overhead expenses and other costs as the company may consider proper, without the consent or knowledge of the purchaser. Such is the nature of the business attempted to be regulated by the act declared unconstitutional.
While the defendant argues that the act is unconstitutional for a great number of reasons, the Court held it unconstitutional for two reasons only: That the police power of the State is too narrow and limited to permit regulation of such a business in the manner attempted by the statute; and that the act interferes, in a constitutional sense, with privileges of contract. A third *434 basis for the decision of the Court, class legislation, is alluded to in the opinion and may have influenced the result reached. Cases cited in this dissent clearly demonstrate that the statute can not be condemned as class legislation. I agree with the majority that the other contentions of the defendant have not substance sufficient to merit consideration.
As noticed in the opinion of the Court, some of the contracts executed by the defendant with purchasers were executed before the effective date of the act held unconstitutional. As to such contracts, I could probably accede to the view of the majority, for the reason that the public policy of the State as to such contracts had not been previously determined by the Legislature. To permit the regulation contemplated by the act, as to that class of contracts, possibly could disturb vested rights. It should be pointed out, however, that even as to those contracts it is open to question whether any vested contractual rights are disturbed. The act simply attempts to regulate the manner in which the purchase money paid for the merchandise or services is handled or preserved as security for the performance of the contract. At least, to save the statute, it could possibly be so applied. It is as to certain rights assumed by defendant to have been created by the contract, though not even mentioned therein, that it actually complainssuch as the right to deduct from the trust funds commissions to be paid to its agents, expected profits and overhead and other costs, the amounts of which are not even indicated. Can one in such a business justly complain that he be required to preserve funds, paid to him in trust, for the very purpose for which the trust was created or the money received? Is it no concern of the public, not a matter of general welfare, that such funds be held in trust for the purpose provided by the contract, the proper burial of the dead, especially since the contracts, at least in large part, are not to be performed until after the death of one of the contracting parties? Notwithstanding the contract makes no provision as to such deductions, and notwithstanding, insofar as the record shows, the purchasers have no knowledge of the intention of the seller to make any such deductions, or the amounts thereof, the defendant now contends that it can not remain in business unless its interpretation of the contract be accepted and it be allowed to make such deductions, contrary to the provisions of the statute. Do such contentions, in such circumstances, in such a business, indicate potential fraud, or an ugly face of fraud?
There is no doubt that rights of contract are highly favored by protective provisions of the State and Federal Constitutions and by the Judiciary as well. No one, of course, would contend that such constitutional provisions should not be respected. Such rights, however, must give way, in certain instances, to other constitutional rights and privileges, for example, those relating to the general welfare. It is only interference with contractual rights, which in some sense is arbitrary, that legislation will be held to violate constitutional principles. "9. Private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict". Mill Creek Coal & Coke Co. v. Public Service Commission, 84 W.Va. 662, 100 S.E. 557, 558, 7 A.L.R. 1081. See Quesenberry v. Estep, W.Va., 95 S.E. 2d 832; Public Service Commission of West Virginia v. Harpers Ferry & Potomac Bridge Co., 114 W.Va. 291, 171 S.E. 760, certiorari denied 292 U.S. 624, 54 S.Ct. 628, 78 L.Ed. 1479; White v. Raleigh Wyoming Mining Co., 113 W.Va. 522, 168 S.E. 798; Holliday v. Elkhorn-Piney Coal Mining Co., 102 W.Va. 147, 134 S.E. 736; Marlow v. Ringer, 79 W.Va. 568, 91 S.E. 386, L.R.A.1917D, 619; Atkins v. Grey Eagle Coal Co., 76 W.Va. 27, 84 S.E. 906; Ex parte Dickey, 76 W.Va. 576, 86 S.E. 781, L.R.A.1915F, 840; Reaves Warehouse Corp. v. Commonwealth, 141 Va. 194, 126 S.E. 87.
In so far as the instant case is concerned, no material difference exists as to the effect *435 on contractual rights or privileges, between the State and Federal Constitutions. In Chicago, Burlington & Quincy Railroad Co. v. McGuire, 219 U.S. 549, 567, 31 S.Ct. 259, 262, 55 L.Ed. 328, Mr. Justice Hughes, speaking for a full Court, said: "* * * But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. Crowley v. Christensen, 137 U.S. [86] at page 89, 11 S.Ct. 13, 34 L.Ed. 620; Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643. `It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence, and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property.' Frisbie v. United States, 157 U.S. [160, at pages] 165, 166, 15 S.Ct. 586, 39 L.Ed. 657." See Atchison, Topeka and Santa Fe Railroad Co. v. Matthews, 174 U.S. 96, 19 S.Ct. 609, 43 L.Ed. 909; Minneapolis and St. Louis Railway Co. v. Beckwith, 129 U.S. 26, 9 S.Ct. 207, 32 L.Ed. 585; Holden v. Hardy, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780; Erie Railroad Co. v. Williams, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155.
Some of the fields or affairs of business wherein regulatory legislation under the police power, comparable to that herein involved, has proved effective in furtherance of the general welfare, are: banking, usury contracts, insurance contracts, annuity contracts, securities, negotiable instruments, building and loan associations, small loan businesses, pawnbrokers, credit buying, payment of wages, regulation of hours of employment, other employer-employee relations, warehouse transactions, bulk sales, re-sales, rebates, workmen's compensation laws, farm programs, mechanics liens, advertising, weights and measures, zoning laws and undertaking. Excluded from the illustrated class are businesses which may not only be regulated but prohibited, such as prostitution or betting. It may be interesting to note that in a very recent case, Quesenberry v. Estep, supra [95 S.E.2d 836] this Court specifically held that Rules promulgated by the West Virginia Board of Embalmers and Funeral Directors, pursuant to statutory authority, relating to "solicitation of business" and to "advertising", constitute a "valid exercise of the police power of the State, in relation to embalming and funeral directing". Are not the activities of agents of the defendant, in soliciting and obtaining the burial contracts, to whom the commissions to be deducted from the purchase price are to be paid by defendant, as clearly a "solicitation of business" as the activities of undertakers prohibited by the decision in that case?
From the authorities considered, the conclusion seems inescapable that as to any business wherein potential fraud may exist, or where one of the contracting parties, because of circumstances or conditions, may possibly be put to a disadvantage, the police power of the Legislature extends thereto. In 16 C.J.S. Constitutional Law § 187, it is stated: "Enactment of statutes having for their object the prevention *436 of fraud and deceit is within the police power of the state; and such power may be exercised to protect the ignorant and rash, as well as the intelligent and prudent, from being imposed on." In Atchison, Topeka and Santa Fe Railroad Co. v. Matthews, 174 U.S. 96, 19 S.Ct. 609, 613, 43 L.Ed. 909, it is pointed out that "While cases on either side and far away from the dividing line are easy of disposition, the difficulty arises as the statute in question comes near the line of separation. Is the classification or discrimination prescribed thereby purely arbitrary, or has it some basis in that which has a reasonable relation to the object sought to be accomplished? * * *". See Powell v. Commonwealth of Pennsylvania, 127 U.S. 678, 685, 8 S.Ct. 992, 1257, 32 L.Ed. 253.
In State ex rel. Fishback v. Globe Casket & Undertaking Co., 82 Wash. 124, 143 P. 878, 879, L.R.A.1915B, 976, some of the potential evils of just such a contract as here considered were pointed out in this language: "Again, the contract is not one that the courts will strain the laws to uphold. It is freighted with the greatest possibilities for fraud. Since the corporation was organized under the general incorporation laws, it could enter upon its business when its capital stock was all subscribed. It is not required to have or keep any paid-up capital. Its duration is limited to 50 years. The officers of the corporation may handle and dispose of the funds received in payment of the certificates in any manner they please. It is certain that many of these certificates will not be ripe for redemption for a number of years, and it is reasonably certain that some of them will survive the life of the corporation itself. If, therefore, the company were permitted to continue the business, and all or any considerable proportion of these certificates were ever redeemed, it will be a consummation unique in human experience".
Moreover, as to such legislation, the necessity for the exercise of the police power rests exclusively in the legislative branch of the government and will always be upheld unless clearly contrary to or in violation of some right guaranteed by a constitutional provision. "* * * But neither the amendmentbroad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had in certain districts * * *". Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 359, 28 L.Ed. 923. In Powell v. Commonwealth of Pennsylvania, 127 U.S. 678, 685, 8 S.Ct. 992, 996, 1257, 32 L.Ed. 253, the Court pointed out that it is no part of the functions of the judiciary "* * * to conduct investigations of facts entering into questions of public policy merely, and to sustain or frustrate the legislative will, embodied in statutes, as they may happen to approve or disapprove its determination of such questions. The power which the legislature has to promote the general welfare is very great, and the discretion which that department of the government has, in the employment of means to that end, is very large * * *". See Atchison, Topeka and Santa Fe Railroad Co. v. Matthews, 174 U. S. 96, 19 S.Ct. 609, 43 L.Ed. 909.
No comprehensive definition of "police power" has ever been attempted, because, perhaps, its breadth of application is too elastic, too elastic not merely as to the fields of activities reached by it, but also as to times, circumstances and effects. Nevertheless, by the judicial process of inclusion and exclusion, its extent and application have been, in a very definite manner, indicated. In 11 Am.Jur., Constitutional Law, Section 245, it is stated: "The breadth and extent of the police power, covering the exigencies confronting the community, its *437 adaptability, durability, inalienability, and the number of public purposes included in its scope make it a principal pillar of government. It has been stated that the police power in effect sums up the whole power of government, and that all other powers are only incidental and ancillary to the execution of the police power; it is that full final power involved in the administration of law as the means to the attainment of practical justice. Moreover, it has been said that the very existence of government depends on it, as well as the security of the social order, the life and health of the citizen, the enjoyment of private and social life, and the beneficial use of property." In Eubank v. City of Richmond, 226 U.S. 137, 142, 33 S.Ct. 76, 57 L.Ed. 156, the Court, in discussing the police power, quoted with approval from District of Columbia v. Brooke, 214 U.S. 138, 149, 29 S.Ct. 560, 563, 53 L.Ed. 941, as follows: "[It is] the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government". See Erie Railroad Co. v. Williams, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155; Muller v. State of Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551; Holden v. Hardy, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780; Powell v. Commonwealth of Pennsylvania, 127 U.S. 678, 8 S.Ct. 992, 1257, 32 L.Ed. 253; Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923; Tweel v. West Virginia Racing Commission, 138 W.Va. 531, 76 S.E.2d 874, certiorari denied 346 U.S. 869, 74 S.Ct. 123, 98 L.Ed. 379; Blevins v. State Compensation Commissioner, 127 W.Va. 481, 33 S. E.2d 408; Bates v. State Bridge Commission, 109 W.Va. 186, 153 S.E. 305; Holliday v. Elkhorn-Piney Coal Mining Co., 102 W.Va. 147, 134 S.E. 736.
The majority concedes, as it must, Quesenberry v. Estep, W.Va., 95 S.E.2d 832, that the undertaking business, as such, falls squarely within the class of businesses which may be regulated by the Legislature by virtue of the police power, yet it undertakes to separate the business of defendant from that phase of the undertaking business which may be regulated. On one side of the supposed imaginary line it places the casket, but the vault wherein the casket rests is on the other side. On one side of such supposed line is the act of embalming, while the opening and closing of the grave and the actual lowering of the body to its final resting place are on the other side. Can there possibly be any such artificial separation of such phases of such a business? At least, since the age of the Homo Neanderthalensis, ethnologists inform us, men have endeavored to dispose of human bodies with respect, honor and ceremony. That ceremony in this State has almost universally included the casket, the vault, the grave and the lowering of the body to its final resting place. I can conceive of no possible imaginary line which separates a phase of that ceremony into a business not reachable by the police power of the State. To demonstrate almost universal concern and interest as to such matters, touching the general welfare of the people, we need only look from Arlington to the family cemetery at almost every front door. Yet the Court holds, in effect, that that which is of universal interest and concern to the public is no concern of the police power of the State.
The majority concedes that "such subjects as insurance or related risk businesses" fall squarely within the reaches of the police power. Is not the contract under consideration, in fact, a form of insurance or related risk? All authorities which I have been able to find, and none is cited to the contrary, so hold. In Renschler v. State, 90 Ohio St. 363, 107 N.E. 758, 759, L.R.A. 1915D, 501, Ann.Cas.1916C, 1014, a contract to the same effect as the contract here involved, insofar as can be determined from the opinion, was before the Court. In the opinion it was stated: "* * * By all the tests to which the contract may be subjected, it unerringly leads one to the conclusion that the intention of the parties was on the one hand to receive and on the other to provide a fund to pay the burial expenses of the insured.
*438 "The contract being naked insurance and nothing else, it is subject to regulation by the insurance department. State ex rel. [Coleman] v. Wichita Mut. Burial Ass'n, 73 Kan. [179] 181, 84 P. 757; Fikes v. State, 87 Miss. 251, 39 So. 783; State v. Willett, 171 Ind. 296, 86 N.E. 68, 23 L.R.A.,N.S., 197; Guenther on Insurance, § 191; 1 May on Insurance (4th Ed.) § 27; Robbins v. Hennessey, 86 Ohio St. 181, 99 N.E. 319." In addition to the authorities cited in that opinion, see Falkner v. Memorial Gardens Association, Tex.Civ.App., 298 S.W.2d 934; State v. National Co-Operative Burial Association of Galena, 79 Kan. 28, 98 P. 1134; Oklahoma Southwestern Burial Association of Ardmore v. State, 135 Okl. 151, 274 P. 642, 63 A.L.R. 704; Annotation, 68 A.L.R. 1525; Michie's West Virginia Code, 1955, 33-1-3a.
As pointed out in the majority opinion, the case of Falkner v. Memorial Gardens Association, Tex.Civ.App., 298 S.W.2d 934, involving the precise questions decided in the instant case, holds directly opposite to that of the majority herein. The conclusions reached in the Falkner case are substantially supported by other cases. None is cited as holding the contrary, and I find none. See Quesenberry v. Estep, W.Va., 95 S.E.2d 832; Oklahoma Southwestern Burial Association of Ardmore v. State, 135 Okl. 151, 274 P. 642, 63 A.L.R. 704; Renschler v. State, 90 Ohio St. 363, 107 N.E. 758, L.R.A.1915D, 501, Ann.Cas.1916C, 1014; State v. Willett, 171 Ind. 296, 86 N.E. 68, 23 L.R.A.,N.S., 197; State ex rel. Attorney General v. Wichita Mutual Burial Association, 73 Kan. 179, 84 P. 757; State ex rel. Fishback v. Globe Casket & Undertaking Co., 82 Wash. 124, 143 P. 878, L.R.A. 1915B, 976. Apparently, every pertinent question posed in the instant case was answered effectively by the reasoning in the Falkner case, contrary to the answers given in the instant case. In the opinion in the Falkner case it is stated [298 S.W.2d 941]: "Clearly the Act applies alike to all individuals and corporations desiring to sell prearranged or prepaid funeral services or funeral merchandise to be delivered at an undetermined future time dependent upon the death of the contracting party; it is actual classification by the Legislature and it is made to apply to all persons and corporations in the class. 9 Tex.Jur. p. 555, Sec. 119. The Act does not prohibit the conduct of the business but merely regulates it. This the Legislature has the authority to do * * *". In Prata Undertaking Company v. State Board of Embalming & Funeral Directing, 55 R.I. 454, 182 A. 808, 810, 104 A.L.R. 389, after a discussion of the types of businesses which may be regulated by the police power, the Court stated: "* * * The undertaking business is an enterprise of this type, and the safeguarding of the public in relation to its health, safety, morals, comfort, and general welfare is the primary object sought by and is the basis for such legislation. People v. Ringe, 197 N.Y. 143, 90 N.E. 451, 27 L.R.A.,N.S., 528, 18 Ann.Cas. 474; Keller v. State, 122 Md. 677, 90 A. 603; Miller v. Johnson, 110 Kan. 135, 202 P. 619; State v. Norvell, 137 Tenn. 82, 191 S.W. 536, L.R.A.1917D, 586. It is of importance to all that such a business be conducted properly, and only by those who are qualified to carry out its responsibilities. Questions relating to the care of dead human bodies, their embalming and transportation, the location of the business and its equipment, sanitation, danger of infection, or contagion from disease, the obtaining of required certificates and permits before acting, the orderly conduct of funerals and burials, and the like, are all of public concern."
In the instant case the majority indicates its belief that the statute has the effect of prohibiting the business of defendant rather than regulating it. No reason is given for such a conclusion, except the contention of defendant that if refused the right to make the unauthorized deductions from the trust fund, it can not remain in business, and can not replace moneys already expended by it. In considering the question, it must not be overlooked that under the contract *439 defendant is not required to make any expenditure whatever until sometime after the "request" for delivery of the merchandise or performance of the service contracted for, and not even then unless the "full sum" contracted to be paid has actually been received by it. In addition, the defendant collects a "service charge" over and above the sum contracted to be paid and, by the terms of the contract, may "use for the best interests of the Company, or its nominees", the income from the trust fund. In no other business have I been able to observe a practice whereby prospective purchasers are required to furnish or advance capital funds necessary for the operation of a business. The contract involved actually provides a "service charge" to be paid by the purchaser. Does that not necessarily lead the purchaser to believe that no other deduction is intended? The statute condemned does not preclude such a provision. Assuming that the contention of the company is reasonable, could not the payment of such an additional sum be provided for in the contract in the manner of the inclusion therein of the provision relating to the fifty cents service charge, if the purchasers are to be required to pay a sum sufficient to enable defendant to "remain in business"? The most complete and conclusive answer to the question, however, is the well known fact that undertakers now, and always have, successfully operated such businesses, furnishing all such merchandise and services, and more, without payment therefor, before delivery of the merchandise or the furnishing of the services. Assuming, however, that the defendant is correct in its contention, must the general welfare of the people of the State be abrogated, and the right to exercise the police power denied the legislature for the purpose of enabling an individual to remain in business? Must the police power of the State depend on such uncertainties, or should the pre-eminent excellence thereof be deemed more staid? Does it not clearly appear that the contention of necessity for immediate deductions from the trust moneys contracted to be paid to the defendant is for the purpose only of pyramiding profits to the heights hoped for, not merely for the purpose of enabling defendant to remain in business?
To sustain its position, the majority relies on three cases: Traux-Traer Coal Co. v. Compensation Commissioner, 123 W.Va. 621, 17 S.E.2d 330; Marlow v. Ringer, 79 W.Va. 568, 91 S.E. 386, L.R.A.1917D, 619, and State v. Goodwill, 33 W.Va. 179, 10 S.E. 285, 6 L.R.A. 621. The decision in the Traux-Traer Coal Co. case rested on the fact that the legislative branch of the government, in attempting to permit the re-opening of a matter which had been finally judicially determined, constituted, on the part of the legislative branch of the government, unauthorized interference with a function of the judiciary. No one, of course, doubts the soundness of that holding. It has no relation, however, to any question involving the police power of the State. The Marlow case [79 W.Va. 568, 91 S.E. 386] did involve questions relating to interference with contractual rights, as regards the police power, but it held that the statute considered was constitutionally valid as "a valid regulation in the exercise of the police power of the state to prevent and relieve from fraud against creditors". The holding in no sense supports the holding in the instant case.
In State v. Goodwill, the Court held unconstitutional a statute which attempted to regulate contractual rights relating to the manner of payment for labor by persons engaging in mining and manufacturing. Undoubtedly, the statute there considered had the same characteristics, was subject to the same objections, as the statute considered in the instant case. The same questions were considered by the Court. However, a result directly opposite that of the Goodwill case was reached in State v. Peel Splint Coal Co., 36 W.Va. 802, 15 S.E. 1000, 17 L.R.A. 385, Judge Lucas announcing the opinion for the Court. On rehearing, however, the same result was reached, but by an equally divided Court. In Atkins v. Grey Eagle Coal Co., 76 W.Va. 27, 84 *440 S.E. 906, the Court unanimously reached a conclusion opposite that stated in the Goodwill case. In White v. Raleigh Wyoming Mining Co., 113 W.Va. 522, 168 S.E. 798, 799, the holding in State v. Goodwill was effectively overruled in this language: "* * * In Atkins v. Grey Eagle Coal Co., 76 W.Va. 27, 29, 84 S.E. 906, 907, decided in 1915, this court abandoned definitely the attitude taken in State v. Goodwill, and approved the argument of Judge Lucas in State v. Peel Splint Coal Co., 36 W.Va. 802, 15 S.E. 1000, saying: `The argument so well sustained by him need not now be restated or amplified. The trend of it is that the freedom of individual contract must yield to due legislative restraint whenever necessary to conserve the public health, safety, and morals and to promote the general welfare and peace of the community.' * * *". In Keokee Consolidated Coke Co. v. Taylor, 234 U.S. 224, 34 S.Ct. 856, 58 L.Ed. 1288, Mr. Justice Holmes, for a full Court, though mentioning State v. Goodwill, declined to follow the doctrine therein announced and reached a conclusion opposite thereto. In an article by Dean Roscoe Pound, "Liberty of Contract". 18 Yale Law Journal 454, State v. Goodwill was severely criticised and the doctrine therein announced completely discredited. See "Freedom of Contract Under the Constitution", 28 Harvard Law Review 496; Note, 22 Virginia Law Review 946; Note, 16 Virginia Law Review 618. The return to the doctrine of State v. Goodwill, to me, is regrettable retrogression, retrogression in a field where modern progression, within constitutional limits, is essential.
Being of the view that the enactment of the statute held invalid was a valid exercise of the police power of the State by the Legislature, and that the holding in the instant case has the undesirable effect of rolling back the law of this State to the discredited and refuted doctrine of State v. Goodwill, I respectfully dissent.